In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 14-2157

LUCY SIBANDA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

———————————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A89-703-604

———————————

ARGUED NOVEMBER 19, 2014 — DECIDED FEBRUARY 13, 2015

———————————

Before WOOD, *Chief Judge*, and KANNE and TINDER, *Circuit Judges*.

WOOD, *Chief Judge*. After fleeing from her native Zimbabwe to the United States, Lucy Sibanda applied for asylum and other relief from removal. She fears that if she is repatriated, her brother-in-law will exercise his rights under a tribal custom that deems her, his brother's widow, his property and will attempt to rape her as he has done before.

The immigration judge denied Sibanda's application, in part for lack of corroboration of the alleged custom and the attempted rapes. The Board of Immigration Appeals found her account credible, but it dismissed her appeal because of insufficient corroboration for her story.

The Board did not, however, adequately consider whether more corroborating information was reasonably available to Sibanda, and it appears to us that it was not. We therefore grant the petition for review and remand to the agency for further proceedings.

**I**

Arriving in the United States on a non-immigrant visa, Sibanda sought asylum in 2009. In her application Sibanda stated that, after her husband died, her brother-in-law attempted to rape her and force her to marry him. The brother-in-law was enforcing the custom of "bride-price" or *lobola*, as practiced by several tribes in Zimbabwe. After she applied for asylum, the government started removal proceedings.

At her removal hearing, Sibanda testified that she had married her husband, Aaron Sibanda, in 1984. Aaron paid Sibanda's father a bride-price to marry her, as prescribed by the customs of both their tribes, the Ndebele and the Shona. His payment of money and goods, valued at 5,000 Zimbabwean dollars (a considerable sum at the time), effected the transfer of Sibanda from her father to him and his family. One term of this transfer was that, in the event of his death, she would become the property of her husband's family.

That provision was triggered when Aaron died in 2002. His brother, Major Takaza Sibanda (whose title appears to reflect a previous military role) demanded his "property."

He insisted that he rightfully controlled his brother's estate (which included two houses and livestock) as well as Sibanda herself, who he asserted was required to marry him under the bride-price custom. Opposed to this arrangement, Sibanda went to court and received a "Letter of Administration" appointing her the "Executrix Dative" of Aaron's estate. Major Sibanda paid no heed to the court's action. Instead, he sold one of Aaron's homes and insisted that Sibanda marry him (and thereby become his second wife). When she refused, Major Sibanda entered her bedroom one night and attempted to rape her. He did so on other occasions as well, and when she fought him off, he beat her. Once he brought a gun and threatened to put Sibanda's older son, Brian, in jail when the son attempted to intervene.

Sibanda testified that Zimbabwean law did not protect her from Major Sibanda. Major Sibanda and her husband's other brother operated above the law, she explained, because of their status as war veterans who fought for the liberation of Zimbabwe. When Sibanda sought help from the police on two occasions, they told her that they would not intervene in a family matter. When she turned to her own family for assistance, her pleas fell on deaf ears. Her brothers told her that she should marry Major Sibanda so that their family would not have to repay the bride-price.

Sibanda received temporary assistance from her cousin, Zimbabwe's Ambassador to Cuba, but Major Sibanda continued to pursue her. The cousin offered her employment as a housekeeper at the Zimbabwean Embassy in Cuba. Sibanda accepted the offer and worked there from 2003 until March 2008, when the government removed the cousin from his post for allegedly joining a political party opposed to

President Mugabe. During her time in Cuba, Sibanda re-
turned to Zimbabwe approximately once a year, staying for
about a month each time. During these visits, she tried to
take control of her husband's estate and distribute his re-
maining assets. But each time she returned, Major Sibanda
would find her, foil her attempts to control the assets, insist
again that she must marry him, and reinforce the demand
with sexual abuse. During one attack, Major Sibanda tore
her bra; another time, when she refused him, he smashed
her kitchen window. With no help from either her family or
the police, she appealed to a chief of the Ndebele tribe. But
the chief told her that she had to marry Major Sibanda under
the rules of the tribe.

By the time her cousin lost the Cuban ambassadorship,
Sibanda was afraid to travel to Zimbabwe. Major Sibanda
had in 2007 sold the remaining house from her husband's
estate, and so Sibanda no longer had a place to take shelter.
With Major Sibanda, her brothers, and the tribal chief insist-
ing that she was bound by the bride-price custom, she fled to
the United States in 2008 and sought asylum a year later.

Before hearing Sibanda's testimony, the IJ had specifical-
ly requested that she provide corroborating evidence of her
claim. To help her do so, the judge delayed the hearing for
almost two years so that she could find and file supporting
documents by the time the IJ specified—a month before the
hearing. She was not able, however, to come up with much,
and what she had, she presented only at the hearing itself.
She relied on her original handwritten asylum application, a
two-page handwritten statement, birth certificates for herself
and her two children, her marriage certificate, a certificate of
death for her husband, a letter from her cousin regarding her

employment at the Cuban embassy, and the letter of administration that she obtained from a Zimbabwean court. Sibanda also submitted a letter from her younger son, Njabulo. She had received this letter after she arrived in the United States; in it, Njabulo stated that if she returns, Major Sibanda and his brother intend to kill her for "reporting them to the police." She said that she also had another letter from Njabulo informing her that Major Sibanda was still intent on marrying her, but that she did not have it with her. Finally, Sibanda submitted an article about her husband's other brother, Jabulani Sibanda, who had threatened violence to opponents of the Mugabe regime.

This was not enough to satisfy the IJ, who denied Sibanda's application for relief. He found that she credibly had testified that a bride-price had been paid for her marriage. He did not, however, resolve the question whether her testimony about her duties to and attacks by Major Sibanda was credible. Instead, he concluded that Sibanda's failure adequately to corroborate her testimony meant that she had not demonstrated past persecution. The IJ observed that she had not presented a country report or "any statements from any authority or anyone else who was aware" of the attacks or his demands. The IJ also concluded that Sibanda had not demonstrated a well-founded fear of future persecution because she had not had contact with Major Sibanda since she came to the United States. Finally, the IJ concluded that Sibanda's asserted social group (women of the Ndebele tribe subject to the bride-price custom) was insufficient because it did not appear that the "custom establish[ed] an immutable characteristic."

The Board dismissed Sibanda's appeal. It deemed Sibanda's testimony credible in light of the IJ's failure to make an explicit credibility determination, as required by 8 U.S.C. § 1158(b)(1)(B)(iii). Nonetheless the Board rejected Sibanda's request for relief on the ground that she failed to comply with the IJ's reasonable request for corroborating evidence, such as "country conditions" reflecting her specific bride-price obligations, or "letters or affidavits" or "a police report" confirming her attacks.

## II

An IJ is within her rights to ask for corroborating evidence, but there are limits to that authority. The statute provides that "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided *unless the applicant does not have the evidence and cannot reasonably obtain the evidence*." 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added); see *Raghunathan v. Holder*, 604 F.3d 371, 379 (7th Cir. 2010); *Krishnapillai v. Holder*, 563 F.3d 606, 618 (7th Cir. 2009). The principal question in the petition before us is whether the IJ and the Board properly considered and applied the part of the statute we have highlighted. We review the IJ's decision as supplemented by the Board, *Mustafa v. Holder*, 707 F.3d 743, 750 (7th Cir. 2013), and will reverse a finding that corroboration was reasonably available only if a "reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4)(D); see *Raghunathan*, 604 F.3d at 379.

The Board assumed, and so will we, that Sibanda is credible. We thus turn immediately to the question whether the record compels the conclusion that (more) corroborating ev-

idence was not reasonably available. The answer, we con-
clude, is yes. Under the circumstances, Sibanda could not be
expected to furnish a supporting "letter or affidavit" from
her own family or tribe. Her brothers and the local chief both
have sided with Major Sibanda, and so they have no reason
to help her elude him through asylum. See *Zhang v. Gonzales*,
434 F.3d 993, 999 (7th Cir. 2006) (holding that an affidavit
from an applicant's wife was unavailable where the appli-
cant credibly testified that his wife was hostile to him). Let-
ters from Sibanda's two sons recounting past attacks were
also not reasonably available. Based on the record now be-
fore us, it appears that only the older son had witnessed an
attack, and he was threatened by his gun-wielding uncle
when he tried to intervene. Compare *Hor v. Gonzales*,
421 F.3d 497, 501 (7th Cir. 2005) (concluding that applicant's
co-workers would be unlikely to submit affidavits when
they knew of persecutors' "murderous potential").

It was also unreasonable for the Board to expect that a
police report about the attacks would exist. Sibanda testified
that the police twice told her that they would not help her.
Why would the police write a report documenting their in-
difference? Sibanda did corroborate that she had contacted
the police: she produced a letter from her younger son,
Njabulo, stating that her two brothers-in-law were going to
try to kill her for reporting them to the police. The Board
discounted this letter because the son did not mention the
attack that it thought he had witnessed. But the Board con-
fused one of Sibanda's sons for the other. The letter was
written by Sibanda's younger son, not her older son, Brian,
the one who witnessed the assault.

In addition to the hostility, intimidation, or indifference of family, friends, and the police, a third reason explains the lack of corroboration: the absence of eyewitnesses. A letter corroborating an attack is reasonable to expect only when the witness independently saw the events. See, *e.g.*, *Weiping Chen v. Holder*, 744 F.3d 527, 530, 533 (7th Cir. 2014) (expecting corroboration from fellow merchants was reasonable where their shops, together with applicant's shop, were destroyed by government in the same incident); *Krishnapillai*, 563 F.3d at 619 (expecting corroboration from wife was reasonable where she had witnessed applicant's persecution); *cf. Raghunathan*, 604 F.3d at 380 (dismissing as insufficient corroboration a letter from applicant's mother because "his mother did not witness the events in question, but merely retold [Applicant's] version of events"). But the only witness to Major Sibanda's attacks whom Sibanda mentions is her older son, Brian—the one Major Sibanda threatened when he attempted to help his mother.

The IJ and Board also unreasonably demanded that Sibanda furnish reports of country conditions. In fact, somewhat irregularly, the record indicates that the IJ had access to some outside information. During the hearing, he quizzed Sibanda about the custom of bride-price, comparing her answers to a Wikipedia article he had in front of him. But we have no way of knowing what that article said or how reliable it was, and it appears that the IJ never shared the article with Sibanda. Asylum regulations and case law invite IJs to consider reports produced by the State Department and other credible sources in evaluating country conditions. See 8 C.F.R. § 208.12(a); compare *Hui Lin Huang v. Holder*, 677 F.3d 130, 138 (2d Cir. 2012) ("State Department reports are … usually the best available source of infor-

mation on country conditions" (internal citations and quotation marks omitted)) to *Singh v. Holder*, 720 F.3d 635, 643–44 (7th Cir. 2013) (chiding the same IJ as in this case for finding facts through Wikipedia). Although the IJ was not required to obtain country reports on his own initiative, see *Meghani v. INS,* 236 F.3d 843, 848 (7th Cir. 2001), in this case, because the IJ already had found the Wikipedia entry, he could just as easily have retrieved more reliable country reports and properly put them into the record. In practice, the "reasonably available" requirement ensures that an IJ is supplied with evidence that is reasonably available to the *applicant* and that corroborates an applicant's *particular* situation. See, *e.g.*, *Weiping Chen*, 744 F.3d at 533 (requiring corroborating evidence about government's demolition of applicant's store); *Raghunathan*, 604 F.3d at 380 (requiring corroborating evidence about medical treatment applicant underwent following assault); *Eke v. Mukasey*, 512 F.3d 372, 381 (7th Cir. 2008) (requiring corroborating evidence about applicant's sexual orientation).

Even if Sibanda had supplied the reports herself, they would have shown only that her claim was plausible; they could not have corroborated her specific experience with bride-price and the attacks by Major Sibanda. The State Department report from 2011 states only that "[d]espite legal prohibitions, women remain vulnerable to entrenched customary practices, including … forcing widows to marry the brothers of their late spouses." U.S. DEP'T OF STATE, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 2011: ZIMBABWE, at 40–41 (2011), *available at* http://www.state.gov/documents/organization/186469.pdf. A report from the Australian government, which refers to the practice as "widow inheritance" or *kugara nhaka*, offers only slightly more. It states that the

practice is still quite common and that women who resist it have few protections and are often subject to violence, especially where, as here, the persecutors are connected with Zimbabwe's governing party. AUSTRALIAN GOV'T, REFUGEE REVIEW TRIBUNAL, COUNTRY ADVICE: ZIMBABWE, ZWE37973, at 1, 3, 5 (Jan. 14, 2010), *available at* http://www.refworld. org/docid/505aff862.html.

Evidence of country conditions "cannot substitute for an individualized determination of an asylum or withholding claim," *Zheng v. Gonzales*, 409 F.3d 804, 811 (7th Cir. 2005). Sibanda, as we have explained, could not reasonably have presented more corroborating evidence than she did. That fact means that there can be no avoiding a careful assessment of her credibility. The IJ did only half of the job: he found that the bride-price was paid, but he bypassed the question whether her account of the duties imposed by bride-price and the attacks she suffered was credible. The Board assumed Sibanda's credibility on all issues, but then it unreasonably demanded corroboration. The IJ must determine whether Sibanda's account of her duties under local law and custom to Major Sibanda is accurate and whether her testimony about his attacks is credible. If he finds her credible on these matters, that is enough to show past persecution.

Three other issues deserve brief comment. First, the IJ concluded that Sibanda did not show that she was part of a particular social group. The Board did not address this finding, and the government has thus requested that we refrain from deciding it. We agree that this should be decided by the Board in the first instance. See *INS v. Ventura*, 537 U.S. 12, 16–17 (2002). We note, however, that on the record presently

before us, Sibanda's proposed social group—married women subject to the bride-price custom—appears to fall easily within this court's established definition of particular social group. See *Cece v. Holder*, 733 F.3d 662, 669–70 (7th Cir. 2013) (en banc); see also *Ngengwe v. Mukasey*, 543 F.3d 1029, 1031–32, 1034 (8th Cir. 2008) (concluding that a widow from Cameroon stated a claim for asylum as a member of a particular social group where she resisted marrying her brother-in-law and suffered persecution as a result). Second, neither the IJ nor the Board decided whether the Zimbabwean government, because it is either "unable or unwilling" to stop Major Sibanda, see *Halim v. Holder*, 755 F.3d 506, 512 (7th Cir. 2014), is complicit in his conduct. That issue remains open on remand. Finally, the Board, agreeing with the IJ, decided that Sibanda did not show a well-founded fear of *future* persecution because she had no evidence of ongoing threats from Major Sibanda. Because a finding of past persecution would create a rebuttable presumption of persecution in the future, see *Stanojkova v. Holder*, 645 F.3d 943, 946 (7th Cir. 2011), the relevance (if any) of this ruling may change on remand.

### III

We GRANT the petition and REMAND for further proceedings consistent with this opinion.