In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1477

GONCHIGSHARAV NADMID,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A097-701-886

ARGUED NOVEMBER 18, 2014 — DECIDED APRIL 21, 2015

Before BAUER, MANION, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Gonchigsharav Nadmid, a Mongolian businessman, petitions for review of the denial of his application for asylum and withholding from removal based on (1) his political opinion denouncing two prominent and corrupt politicians by name at a public rally and (2) his membership in the social group of business owners who seek to expose and end corruption between politicians and

businesses. Because the adverse credibility determination of the immigration judge was flawed, we grant the petition and remand for further proceedings.

## I. BACKGROUND

Nadmid, a 57-year-old native and citizen of Mongolia, came to the United States in 2003 on a visitor's visa and overstayed. After being arrested in Pennsylvania for driving under the influence, he voluntarily departed in 2006 and re-turned to Mongolia, where he started a business manufacturing construction materials.

Nadmid returned to the United States in late 2009, presenting the same visa he had obtained six years earlier. He was detained at Chicago O'Hare International Airport, where a Customs and Border Patrol officer, through a Russian translator, conducted two interviews with him. During the first interview, Nadmid answered basic biographical questions, informed the officer that he was coming to the United States to visit his daughter (who holds a green card), and answered "no" when asked if he feared returning to Mongolia. In a second interview later that day (and after speaking with his daughter), Nadmid told the officer that, if returned to Mongolia, he feared being killed by agents from Oyu Tolgoi (a large, partially government-owned mining operation in Mongolia), whose demand for $200,000 he had rebuffed. Nadmid mentioned several instances in which thugs, including a man named Tsegmid, confronted and threatened him at his business. A month later an asylum officer conducted a credible-fear interview, this time through a Mongolian translator, and determined that Nadmid did have a credible fear of persecution.

In an affidavit accompanying his asylum application and in his testimony at his removal hearing in 2011, Nadmid described his political activity in Mongolia and the consequences he faced for speaking out against political corruption. He recounted that in mid-2009 he participated in an anti-corruption protest in the capital city of Ulaanbaatar, at which he spoke out on stage and accused two politicians from the ruling Mongolian People's Party of misappropriating public funds. Five days after the protest, several unidentified men showed up at his business and assaulted him, knocking him unconscious with a metal rod to his head; afterward he had to be hospitalized. Nadmid's assailants did not address him directly but he overheard them saying that he "talks too much shit." The following month the men returned but Nadmid managed to slip out through the back door. Several weeks later two different men confronted him at his business and demanded $200,000, a sum well beyond Nadmid's means. Nadmid returned home later that day to find that his kitchen window had been smashed by two bricks thrown inside.

A month later Nadmid sought out a reporter to publicize his continued opposition to governmental corruption and to show his harassers that he would not be intimidated. Soon thereafter the newspaper Mongolia Today ran a brief story profiling Nadmid as a small businessman who denounced corruption and refused to contribute to the Mongolian People's Party.

A few weeks after the article was published, Nadmid recounted further, he was abducted at his business and taken to a cemetery. He managed to escape with the help of one of the assailants, Tsegmid, who had been a business acquaint-

ance of his in the 1990s. After the incident, Nadmid shut-
tered his business and hid at campsites away from the capi-
tal; he left Mongolia in December. The day after he left, a no-
tice bearing his photo was published in the Ulaanbaatar
Times seeking information on his whereabouts and offering
a reward.

Nadmid supplemented his application with the newspa-
per profile, the published notice seeking his whereabouts, a
medical certificate confirming his post-beating treatment, his
business license, and an excerpt from a report by the United
States Agency for International Development documenting
pervasive and increasing corruption in business and politics
in Mongolia. He also offered the declaration and testimony
of Dr. Alicia Campi, the president of a Mongolian business
consultancy company who holds a Ph.D. in Mongolian stud-
ies and specializes in Mongolian politics, economics, and
human rights. Dr. Campi testified that corruption in Mongo-
lia was widespread, that the two politicians Nadmid had
singled out at the rally were known for corruption and vio-
lent retaliation against opponents, that she had been able to
confirm the authenticity of Nadmid's identification docu-
ments through contacts in Mongolia, and that the newspaper
article and notice resembled those she had seen in Mongoli-
an newspapers.

The IJ concluded that Nadmid did not qualify for asylum
because he was not credible and did not sufficiently corrobo-
rate his claim. Nadmid testified consistently with his written
affidavit, the IJ acknowledged, but the inconsistencies be-
tween his testimony and the transcripts of his two airport
interviews were "significant problems." In the airport inter-
views, for instance, Nadmid had portrayed the threats as

arising from a personal dispute and did not mention speaking at an anticorruption rally. At these interviews, he also give different dates for the alleged incidents and described Tsegmid's role inconsistently. Nadmid, the IJ added, did not convincingly explain why he overstayed his visa in 2003 or why his persecutors believed he would have as much as $200,000 after he returned to Mongolia with such few assets.

Because his testimony was not credible, the IJ determined that Nadmid needed to submit corroborating evidence. The IJ gave little weight to the newspapers, which he assumed had not been identified in the record, or to the medical certificate because it was poorly translated. The IJ also found Dr. Campi's testimony reliable but insufficient because she lacked personal knowledge of Nadmid's story. In the IJ's view, Nadmid should have provided further documentation of his business activities in Mongolia and affidavits from friends, family members, or employees who witnessed his speech at the 2009 rally or the attacks against him.

And even if Nadmid's testimony were credited, the IJ added, members of Nadmid's proposed social group— "Mongolian business owners who seek to expose and end political corruption of private businesses"—had nothing in common except being targeted for persecution, and was premised on a profession rather than any immutable and fundamental characteristic. Nor could Nadmid demonstrate a nexus between a protected ground and the persecution he suffered because he showed only that his attackers were "motivated by greed" and sought simply to extort money from him. Finally the IJ found that Nadmid did not qualify for withholding of removal or for protection under the Convention Against Torture.

The Board upheld the IJ's findings about credibility, corroboration, and CAT, and dismissed Nadmid's appeal. It did not consider the IJ's alternative findings concerning social group membership or nexus.

## II. ANALYSIS

In his petition for review, Nadmid challenges the adverse credibility finding and specifically the reliability of the airport interviews on grounds that he is not fluent in Russian, as reflected in interview transcripts that reveal significant inconsistencies and language difficulties.

Although an IJ may consider airport interviews in making a credibility determination, they must be reliable, and may be less so where the asylum applicant's answers suggest that translation problems have made it difficult to understand the questions posed to him. *Moab v. Gonzales*, 500 F.3d 656, 660–61 (7th Cir. 2007); *Balogun v. Ashcroft*, 374 F.3d 492, 504–05 (7th Cir. 2004). These problems are particularly acute when the translator does not speak the applicant's native language, but instead translates the questions into a language in which the applicant is only minimally proficient. *See Ememe v. Ashcroft*, 358 F.3d 447, 451–52 (7th Cir. 2004); *Sing v. INS*, 292 F.3d 1017, 1022–23 (9th Cir. 2002).

We agree with Nadmid that the IJ incorrectly relied on the airport interviews to discredit him. First, the IJ mischaracterized the record when he stated that Nadmid testified that he told the Customs and Border Patrol officer that he "requested a Russian interpreter." The record does not reflect that Nadmid testified to making such a request; he testified that immigration officers asked him what languages he spoke and provided a Russian interpreter after he responded

that he spoke Russian. Second, the IJ concluded that the transcripts of the airport interviews showed "detailed, coherent responses." But the transcript contains several contradictory statements made in quick succession that suggest that Nadmid faced a significant language barrier in understanding the questions being asked him.[1] Third, the IJ stated that Nadmid had learned Russian when he had attended a technical school in Russia for three years. But the IJ did not

---

[1] The transcript shows confusion over the name of the firm ostensibly lending money to Nadmid and whether the firm lent money to Nadmid or sought merely to extort him:

> Q: Who is going to kill you?
> A: A private firm lent me a large sum of money and I have failed to repay the money. Now they have been threatening me.
> Q: What is the name of the firm?
> A: The company name is Tsegmid.
> …
> Q: How much money did you borrow from them?
> A: This is the company that takes my money.
> Q: You said that they lent you money?
> A: They only take money.
> …
> Q: How do they take your money?
> A: They have never taken any money from me, they seek to take money from me.
> …
> Q: You told me that you borrowed money from them. When did you borrow money from them?
> A: No it never happened.
> …
> Q: Who contacts you in the company?
> A: Tsegmid is the name of a person, not the company.
> Q: Why did you tell me it was the name of a company?
> A: My Russian isn't very good.

acknowledge that Nadmid attended the technical school more than 30 years before the airport interviews, that the classes there were taught both in Russian and through interpreters, and that Nadmid stated that he did not use Russian in his business in Mongolia. Finally, the IJ disregarded Nadmid's repeated demurrals that he spoke Russian poorly—at the airport interview itself, at his first appearance in the immigration court less than two months later, and during his testimony at the removal hearing.

The government does not respond to Nadmid's challenge to the adverse credibility finding, and instead argues that the petition must outright be denied because Nadmid failed before the Board and in this court to contest a separate dispositive issue—the IJ's ruling that he failed to corroborate his claim with reasonably available evidence. But the government's first contention, that Nadmid failed to exhaust his administrative remedies by not raising the corroboration issue before the Board, is incorrect. The Board independently addressed the issue in its decision, and once the Board addresses an issue on its own, it is exhausted. *See* 8 U.S.C. § 1252(d)(1); *Arobelidze v. Holder*, 653 F.3d 513, 516–17 (7th Cir. 2011). The government, however, is correct that Nadmid has waived the issue by failing to discuss it in his brief here. *See Firishchak v. Holder*, 636 F.3d 305, 309 n.2 (7th Cir. 2011).

Waiver of the corroboration issue, though, does not resolve the case in the government's favor. It is generally true that an applicant's failure to comply with an IJ's request for corroborating evidence will doom a claim when such evidence is reasonably available. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Raghunathan v. Holder*, 604 F.3d 371, 379 (7th Cir. 2010);

*Krishnapillai v. Holder*, 563 F.3d 606, 618–19 (7th Cir. 2009). But an applicant's testimony alone "may be sufficient to sustain the applicant's burden without corroboration." 8 U.S.C. § 1158(b)(1)(B)(ii). Thus, if an IJ explicitly premises a demand for corroborating evidence on an adverse credibility determination that is flawed, as happened here, then a reassessment of credibility may turn out to remove the need for corroboration. *See Rapheal v. Mukasey*, 533 F.3d 521, 528–30 (7th Cir. 2008). The case must be remanded for a reassessment of Nadmid's credibility.

Nadmid also challenges the IJ's alternative findings that, assuming Nadmid to be credible, his proposed social group lacked an immutable or fundamental characteristic and that no nexus could be shown between the persecution he suffered and his political opinion or membership in his particular social group. The Board did not address these alternative findings, and we will not address them in the first instance. *See INS v. Ventura*, 537 U.S. 12, 16–17 (2002); *Sibanda v. Holder*, 778 F.3d 676, 681 (7th Cir. 2015). On remand they deserve scrutiny.

## III. CONCLUSION

We Grant the petition and remand for further proceedings consistent with this opinion.