# United States Court of Appeals
## For the First Circuit

No. 14-1186

UNITED STATES OF AMERICA,

Appellee,

v.

CECILIO MERCEDES-DE LA CRUZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Daniel N. Marx, with whom Robert E. Toone, Michele L. Adelman, Shrutih Ramlochan-Tewarie, and Foley Hoag LLP were on brief, for appellant.
Susan Z. Jorgensen, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 26, 2015

**LYNCH, Chief Judge**.  This is the rare case in which we find on direct appeal that there was ineffective assistance of defense counsel and so vacate a conviction and remand for further proceedings.

Defendant Cecilio Mercedes-De La Cruz appeals his conviction and sentence for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine.  Mercedes' primary argument as to his conviction, made under two doctrines, is that the government agents who arrested him lacked probable cause to do so.  First, Mercedes contends that the failure of the district court to suppress incriminating statements that he made shortly after the arrest was plain error.  Second, he argues that, in any event, the failure of his counsel to file a timely motion to suppress that evidence was a blatant display of ineffective assistance of counsel.  Mercedes also challenges his sentence, arguing that the district court (1) improperly increased his sentence by making an unsupported finding that Mercedes was not truthful at his sentencing hearing and (2) erroneously failed to apply the safety valve under 18 U.S.C. § 3553(f).

We agree with Mercedes' ineffective assistance of counsel argument and need not reach the plain error issue, and so we vacate his conviction and remand for further proceedings.  The record is sufficiently developed and the facts concerning the apparently unjustified arrest and counsel's failure to move to suppress are

sufficiently egregious as to warrant relief.  We also reach the issue of whether there was sentencing error, lest the error recur or have some lingering effect in the event of retrial.

I.

On the evening of September 16, 2012, federal agents conducted surveillance of a remote stretch of miles of coastline in the southeast region of Puerto Rico suspected to be an area of drug trafficking activity.  The region was known to be a common debarkation point for drug shipments.  It is a mountainous rural region with a lot of brush.

Customs and Border Patrol Agent Luis Capestany was patrolling Puerto Rico State Road 901, which runs near the coast. He encountered a white van "in three different locations in [a] very small amount of driving distance," which he found suspicious. A vehicle registry check revealed that the van was registered to Jose Miguel Guzmán-De los Santos.[1]

Around 3:30 A.M., Capestany learned from his superiors that there was a boat traveling toward the coast with its lights out.  A helicopter spied the vessel near a point on the coast called Punta Toro.  Capestany continued patrolling and encountered

---

[1] Guzmán, a codefendant in this case, was convicted of conspiracy to possess with intent to distribute cocaine.  He appealed his conviction and sentence, see United States v. Guzmán-De los Santos, No. 14-1209, but we dismissed the appeal after the district court issued an order stating that it would dismiss the indictment.

a gold Hyundai station wagon with 19-inch nickel chrome rims at a point where Road 901 intersected with a road going to the coast. The vehicle turned onto Road 901 and began driving northbound. Capestany found this suspicious in light of the time of night and the remote nature of the area. He ran the Hyundai's plates and discovered that they were registered to a Mazda.

Shortly afterward, Capestany saw three individuals run from the direction of the beach and "spe[e]d off" along Road 901 in a red two-door coupe. Capestany notified the other agents in the area of the suspicious activity he had observed.

By that time, the vessel which the agents had been monitoring had neared the coastline near Punta Toro. There is no evidence there had been previous drug encounters on the Punta Toro beach. Capestany called for backup, and he and seven other agents eventually made their way down a gravel road toward Punta Toro. They encountered approximately six residences along that road, which were inhabited and "well kept."

Around 4:30 A.M., the agents encountered an abandoned red Ford Excursion stuck at the end of the gravel road. There were several containers of gasoline next to the vehicle, but the agents did not find any people or contraband nearby at that time. Capestany and five of the agents continued walking toward the shore along a grass trail, while two of the agents, Wilfredo Vega-Flecha and a municipal police officer, who were armed, stayed behind at

-4-

the end of the gravel road to "mak[e] sure that nobody would try to take that vehicle out."

Approximately half an hour later, in the darkness of the early morning in an unlit area, the two agents next to the Excursion heard a noise in a nearby wooded area. Vega had night-vision goggles and used them to observe an individual -- later identified as Mercedes -- walking out of the woods toward the Excursion. He did not observe any weapons with the man.

Mercedes could not see the agents because it was still dark. Vega testified that the two agents told Mercedes to stop, and "[h]e raised his hands, and we placed him under arrest" (emphasis added). The government does not dispute that Mercedes was arrested immediately after Vega stopped him. There was no Terry stop; there was, rather, an immediate arrest.

The other six officers eventually discovered 33 bundles containing nearly 1000 kilograms of cocaine near a dry creek bed about 100 feet away from the Excursion. The boat that had apparently delivered the drugs was found abandoned in the sand with its lights on. However, Vega and his partner did not know about the discovery of the drugs or the boat at the time of Mercedes' arrest. At trial on direct examination, Vega said only that he saw Mercedes coming toward him, "told him to stop," and arrested him. Vega did not mention any concern for officer safety. On cross-examination, when asked why he arrested Mercedes, Vega replied:

> Well, first of all, he is in a place where there is a vehicle that is presumed to be in the drug trafficking. He doesn't know about the place because he seems to be from another places [*sic*]. I don't know him. For my safety, I placed him under arrest.

Only after the arrest did the two officers search Mercedes; they found a wallet with identification and $20 cash. They found no weapons. They saw that Mercedes was wet from the waist down. Vega asked Mercedes, "How many are you?" Mercedes did not respond, and Vega asked him again. Mercedes said, "Four." Vega then asked (again twice) how much Mercedes had been paid "to do this job." Mercedes responded, "$1,000."

At that time, several other officers arrived on the scene, and Vega instructed them to take Mercedes and "place him in a cell at the Maunabo station house." Mercedes was later taken from Maunabo to the Puerto Rico Police Marine Unit in Humacao, and then to the main office of Homeland Security Investigations in Miramar. Mercedes was handcuffed while in the vehicle.

Upon Mercedes' arrival in Miramar, a Homeland Security investigator, Angel Ortiz, led Mercedes to a detention cell area. At that point, Ortiz testified, Mercedes made "several spontaneous statements" that he had "done this for $1,000" and that "he really didn't know who the owners were of whatever it was that he was doing." Ortiz stopped Mercedes from speaking because Ortiz had not yet administered Mercedes his <u>Miranda</u> rights, nor had anyone else.

Once the group reached a processing cell, Ortiz read Mercedes his <u>Miranda</u> rights and had him sign forms indicating that Mercedes understood his rights and would waive them. Ortiz then interviewed Mercedes. Mercedes recounted that a person had approached him on the previous day and asked him "if he wanted to make $1,000"; that he had traveled to the coast in a van and helped unload white sacks from the boat on the coast; and that all of the men unloading the boat's cargo had run away when they saw a helicopter approaching the vessel. Mercedes indicated that, after he started running, the "next thing he knew [was] that two police officers had apprehended him."

Mercedes and co-defendants Guzmán and Victor Manuel Carela[2] were indicted on September 27, 2012, on two charges: conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. The district court issued a scheduling order requiring all motions to suppress to be filed by "November 2, 2012 or, if the case is continued, no later than fourteen (14) days before the trial date." Counsel for Guzmán and Carela both filed motions to suppress statements their clients had made during and after their arrests on the grounds that their arrests were illegal. The co-defendants' motions were based on very different facts far less favorable to those defendants than

---

[2] Carela has also appealed his conviction and sentence. <u>See</u> <u>United States</u> v. <u>Carela</u>, No. 14-1194.

the facts were as to Mercedes. The district court denied both motions. Mercedes' counsel did not file a motion to suppress.

There were two trials in this case; the first began on April 15, 2013. On the first day of that trial, before the jury was brought into the courtroom, Mercedes' counsel referred to the government's motion in limine, which had asked the court to "preclude the defendants from presenting, at trial, any argument as to the legality of their questioning by law enforcement officers." In that motion, the government had repeated the district court's observation (made in its ruling on the co-defendants' motions to suppress) that Mercedes had waived his right to file a motion to suppress by failing to file one by the court-imposed deadline. Mercedes' counsel acknowledged that he had not filed a motion to suppress, but stated that Mercedes "ha[d] waived no right" and directed the court's attention to the Supreme Court's decision in Crane v. Kentucky, 476 U.S. 683 (1986).[3]

The district court asked Mercedes' counsel what the Crane case "ha[d] to do with being late and not complying with the Court's order." The court reminded counsel that, under the pretrial order, all motions to suppress were required to be filed 14 days before trial. Mercedes' counsel replied that "[t]his is

_____

[3]     Crane held that the circumstances surrounding a defendant's confession are relevant to the confession's credibility, as well as its voluntariness, and that the district court's exclusion of testimony about those circumstances deprived the defendant of his right to a fair trial. 476 U.S. at 687-91.

not a motion to suppress" (emphasis added); he merely wished to cross-examine the agents regarding the circumstances surrounding Mercedes' confession.[4]  The court stated that such questioning would be allowed.

The first trial ended with a hung jury on April 22, 2013. The case was retried three weeks later, on May 13, 2013.  At the beginning of that trial, the court stated that "the . . . rulings stand as to [the parties'] previous motions."  Mercedes' counsel told the court that "concerning the motion to suppress, we will reiterate the case law we quoted the last time."  At no point, however, did counsel explain his failure to comply with the district court's scheduling order or even request leave to file an untimely motion to suppress.

The second jury convicted Mercedes on both counts in the indictment.  This appeal followed.

II.

Mercedes, through different counsel, argues on appeal that there was no probable cause for his arrest and hence that the inculpatory post-arrest statements he made to the agents must be suppressed as fruit of the poisonous tree.  He also argues that his trial attorney's failure to file a motion to suppress on those

---

[4]     Nonetheless, Mercedes' counsel challenged the lawfulness of Mercedes' arrest in Rule 29 motions filed at the close of the government's case in both trials.  The court denied both motions from the bench.

grounds at any time constituted ineffective assistance of counsel in violation of the Sixth Amendment.

We very "rarely review Sixth Amendment claims against trial counsel raised initially on direct appeal." United States v. LaPlante, 714 F.3d 641, 648 (1st Cir. 2013). That is, in part, because such claims usually present factbound questions on which the record is insufficiently developed -- questions about whether counsel's challenged decisions were mistakes of a constitutional magnitude or simply reasonable strategic choices that did not pan out, and about whether any deficient performance actually made the defendant worse off. See id.; United States v. Downs-Moses, 329 F.3d 253, 264-65 (1st Cir. 2003). However, the usual rule does not apply if "the key facts are not in dispute" and the record is "'sufficiently developed to allow a reasoned consideration'" of the claim. Downs-Moses, 329 F.3d at 265 (quoting United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991)).

This is such an exceptional case. We have no difficulty concluding on this record that Mercedes' trial counsel's failure to file a timely motion to suppress amounted to constitutionally deficient performance and that Mercedes was prejudiced as a result.[5]

---

[5] This case does not require us to consider the waiver-related consequences of a failure to file a timely suppression motion under the recently amended Federal Rule of Criminal Procedure 12. See United States v. Anderson, 783 F.3d 727, 740-41 (8th Cir. 2015); United States v. Soto, 780 F.3d 689, 700-01 & n.2

A.          Legal Framework

        "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components."  Strickland v. Washington, 466 U.S. 668, 687 (1984).  First, the defendant must show that counsel's performance was objectively unreasonable "under prevailing professional norms." Id. at 688.  In making this assessment, courts must be "highly deferential" and "indulge a strong presumption that . . . under the circumstances, the challenged action might be considered sound trial strategy."  Id. at 689 (internal quotation marks omitted); accord Woods v. Donald, 135 S. Ct. 1372, 1375 (2015) (per curiam). Second, the defendant must show that counsel's deficient performance resulted in prejudice -- that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; accord Woods, 135 S. Ct. at 1375.  In this specific context, where the alleged ineffectiveness was the failure to file a motion to suppress, in order to show prejudice the defendant must "prove that his Fourth Amendment claim is meritorious" and that there is a reasonable probability that the

_____

(6th Cir. 2015).  Here, Mercedes has argued that his counsel's performance was constitutionally deficient precisely because he failed to file such a motion. We can resolve that claim regardless of whether the suppression claim itself was waived or forfeited. Cf. Kimmelman v. Morrison, 477 U.S. 365, 374 n.1 (1986).

-11-

verdict would have been different had the challenged evidence been excluded.  Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).[6]

B.          Performance

Defense counsel's failure to file a timely motion to suppress Mercedes' post-arrest statements was objectively unreasonable under prevailing professional norms.  The adequacy of the justification for Mercedes' very prompt arrest was an issue in the case.  Defense counsel knew that: he had questioned a government witness at Mercedes' preliminary detention hearing about the circumstances surrounding the arrest, asking if Mercedes had "done anything wrong besides walking around close to a van."  Both of Mercedes' co-defendants, who had far less promising factual grounds, filed timely motions to suppress.  Yet counsel never filed a motion to suppress on behalf of Mercedes, much less a timely one.

The government argues that this "may have been a strategic choice," reasoning that counsel may have wanted instead to cross-examine government witnesses about the circumstances surrounding Mercedes' arrest.  But Mercedes' counsel could have

---

[6]     Importantly, the prejudice inquiry does not require the defendant to show that the unlawfully obtained evidence was unreliable, or that its admission created a risk of convicting an innocent person.  "The 'prejudice' essential to a violation of the Sixth Amendment right to the effective assistance of counsel is not being convicted though one is innocent, although that is the worst kind; it is being convicted when one would have been acquitted, or at least would have had a good shot at acquittal, had one been competently represented."  Owens v. United States, 387 F.3d 607, 610 (7th Cir. 2004) (Posner, J.).

-12-

filed a timely motion to suppress Mercedes' post-arrest statements and still conducted such cross-examination if the motion were denied.  The two courses of action were not mutually exclusive.[7] See Johnson v. United States, 604 F.3d 1016, 1020-21 (7th Cir. 2010) (suggesting that counsel's failure to file a motion to suppress evidence found in a car the defendant had borrowed may have been unreasonable, and rejecting the argument that "it was a better defense . . . for [the defendant] to claim a lack of knowledge that the drugs were in the vehicle" because there was "no inherent conflict between a trial defense based on [the defendant's] lack of knowledge that the drugs were in the car, and a motion to suppress contending that the search violated his reasonable expectation of privacy in the vehicle"); Owens v. United States, 387 F.3d 607, 608-09 (7th Cir. 2004) (finding that counsel's decision to forfeit his client's standing to raise a Fourth Amendment challenge to the search of a house where crack had been discovered by denying that the client owned the house was unreasonable because, "in the unlikely event that the motion failed, the defense could change course and try to prove at trial that it was not [defendant's] house after all").

---

[7] Ironically, Crane, the case defense counsel cited at the beginning of the first trial in attempting to explain his failure to file a motion to suppress, featured just such a strategy: defense counsel filed a motion to suppress the defendant's confession on the ground that it was involuntary, and then, after the motion was denied, tried to pursue lines of attack at trial suggesting that the confession was unreliable and not credible, even if not coerced.  476 U.S. at 684-86.

What is more, a timely motion to suppress on the ground that the agents did not have probable cause to arrest Mercedes would quite likely have been meritorious. As Vega's testimony confirmed, the <u>only</u> fact the agents knew about Mercedes at the time of his arrest which indicated that he might be involved in criminal activity was that he was in the same general area as a suspected drug-smuggling venture.[8]

It is black-letter law that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," <u>Illinois</u> v. <u>Wardlow</u>, 528 U.S. 119, 124 (2000) (citing <u>Brown</u> v. <u>Texas</u>, 443 U.S. 47 (1979)), much less a finding of probable cause, <u>see, e.g.</u>, <u>Ybarra</u> v. <u>Illinois</u>, 444 U.S. 85, 90-91 (1979) (finding no probable cause when "the agents knew nothing in particular about [the defendant], except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale"). Although presence in a "'high crime area'" is a "relevant contextual consideration[]," at least in a <u>Terry</u> analysis, <u>Wardlow</u>, 528 U.S. at 124 (quoting <u>Adams</u> v. <u>Williams</u>, 407 U.S. 143, 144 (1972)), not even that factor is

---

[8] Vega testified that Mercedes was "in a place where there is a vehicle that is presumed to be in the drug trafficking" and that "he seem[ed] to be from another place[]." Vega also said that he arrested Mercedes "[f]or [Vega's] safety" because he "d[idn't] know him."

applicable here. The location where Mercedes was found was hardly a "high crime area." It was a large wooded area with trails near a beach in rural Puerto Rico, and there were five or six "well kept" houses nearby. The officers had no apparent basis on which to conclude that Mercedes was not associated with those houses.

The government's argument that there was no other reasonable outcome than a conclusion that there was probable cause for the arrest is wrong, as well as being confused and unpersuasive. It is confused because the government invokes the "reasonable suspicion" standard utilized for a Terry stop, which does not apply here. This was not a Terry stop. An arrest must be supported by probable cause, see Kaupp v. Texas, 538 U.S. 626, 630 (2003) (per curiam), which is an "obviously" higher burden than reasonable suspicion, Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted). The argument is unpersuasive because the government fails to identify any fact known to the agents before the arrest that would have cast suspicion on Mercedes besides the fact that he was in a "remote area" that "had been the site of drug smuggling over the past month." The government mistakenly argues the agents knew more before the arrest: Mercedes "was found at the crime scene," "was wet and sandy, indicating he had been on the beach," and was walking toward "the getaway vehicle" early in the morning. But the arresting agents did not know that Mercedes was wet until they

-15-

"checked him out" after the arrest, and they did not know that the area was a "crime scene" or that the Excursion was "the getaway vehicle" until they discovered the drugs. At the time of the arrest, they knew a vessel had been spotted coming toward the coast, but they did not know there was cocaine inside or that Mercedes was connected with the boat. "[A] search unlawful at its inception may [not] be validated by what it turns up." Wong Sun v. United States, 371 U.S. 471, 484 (1963). And if officer safety was truly the issue, a Terry stop would have sufficed.

That a timely motion to suppress Mercedes' statements would likely have been meritorious and without repercussion to other defense strategies confutes any argument that counsel's failure to file such a motion was professionally reasonable. See, e.g., Gentry v. Sevier, 597 F.3d 838, 851-52 (7th Cir. 2010); Owens, 387 F.3d at 608-09; State v. Reichenbach, 101 P.3d 80, 84, 87 (Wash. 2004); State v. Silvers, 587 N.W.2d 325, 334 (Neb. 1998); Commonwealth v. Davis, 743 A.2d 946, 953 (Pa. Super. Ct. 1999).

In short, the government has not provided -- and the record does not disclose -- any plausible strategic explanation for counsel's failure to file a timely motion to suppress, and so we conclude that his performance was constitutionally deficient. See Kimmelman, 477 U.S. at 385-86 (finding counsel's failure to file motion to suppress objectively unreasonable because the record suggested "no better explanation" for his failure than "ignorance

-16-

of the law" and "a complete lack of pretrial preparation"); Tice v. Johnson, 647 F.3d 87, 106 (4th Cir. 2011) ("There is simply nothing we can discern from the record that would excuse the defense team's failure to move to suppress [the defendant's] confession."). The mere inconvenience to defense counsel of having to meet a pretrial schedule for filing motions is surely not enough.

C.      Prejudice

We are also satisfied that there is a reasonable probability that, had Mercedes' counsel filed a motion to suppress, the outcome of the proceeding would have been different. As said, had such a motion been filed, it likely would have succeeded, and had it succeeded, many (perhaps all) of Mercedes' inculpatory statements would have been excluded as "fruit of the poisonous tree." See generally Brown v. Illinois, 422 U.S. 590, 602-04 (1975); Wong Sun, 371 U.S. at 487-88; United States v. Stark, 499 F.3d 72, 76-77 (1st Cir. 2007).

The government's case against Mercedes was based almost exclusively on those statements. Indeed, in the government's closing argument, the prosecutor repeated that Mercedes had admitted his involvement in the transaction nearly every time she mentioned him, and she referred to scant other evidence of his participation. Cf. United States v. Melvin, 730 F.3d 29, 40 (1st Cir. 2013) (relying on prosecutor's closing argument to determine whether improperly admitted testimony was sufficiently important to

-17-

the government's case so as to require vacatur of the defendant's conviction). There was no assertion that any of the other defendants had identified Mercedes as involved in unloading the cocaine. Exclusion of the post-arrest statements would likely have eviscerated the government's case. See, e.g., Tice, 647 F.3d at 111; Reichenbach, 101 P.3d at 87.

### III.

Our decision to vacate Mercedes' conviction might be thought to render it unnecessary to reach his claims of sentencing error. Nevertheless, to prevent possible recurrence, we think it appropriate to add this coda regarding the sentence imposed by the district court.

At sentencing, the defense contended that Mercedes should be considered "a minor participant" for purposes of his Sentencing Guidelines calculation because "there was no evidence whatsoever that demonstrated that [he] in any way was a principal in this case." Instead, Mercedes argued, he was "merely a workman." The government disagreed, stating that Mercedes was "an integral part" of "a $22 million convert [*sic*] offloading operation which required individuals of trust." As support, the prosecutor pointed to Mercedes' confession that "he was paid $1,000 and that . . . he was involved in the offloading of the narcotics," and to the fact that he ran away when he saw the helicopter, suggesting "that he knew what he was doing was wrong."

-18-

After counsel made these arguments, the district court gave Mercedes an opportunity to allocute. The following colloquy ensued:

> THE DEFENDANT: Well, I would like to say to you that, as far as I know, I don't believe there is any evidence that makes me responsible for that.
>
> THE COURT: For what?
>
> THE DEFENDANT: For the circumstances that the Prosecutor is referring to, because he did not see me with that. And if he didn't see me with that and he doesn't have any fingerprints of mine on that, he cannot make me guilty of that.
>
> THE COURT: But you were there.
>
> THE DEFENDANT: I was on the road. A policeman arrested me, and he took me. They had a red truck.
>
> THE COURT: That's not how I remember the case, Mr. Mercedes. If I remember the case, you were arrested right there as you came out of the bushes with your hands up.
>
> THE DEFENDANT: Well, that's the version from the policeman that arrested me. And he said three versions at the same time, and none of them were justified. My attorney asked him at what moment he had arrested me, and he said he arrested me because he saw me as a suspect around there.
> On that day, the 17th of September, 2012, the sun came out around 6:13 in the morning, and he said he had binoculars, night vision goggles, and that he had arrested me at 6:00 in the morning. And at 6:30 in the morning, if he has those night vision goggles that he had arrested me at 6:30 -- but at 6:13 is when the sun came out. What can he do with that on his face at that time in the morning, at 6:30?

-19-

I think it was verified that he was not precise continuously as to that.  And as to everything else, those are things that I leave at your sound discretion.

Thank you.

The district court granted the minor participant reduction and calculated Mercedes' guidelines sentencing range as 121 to 151 months.  The court then found that Mercedes had been untruthful in his allocution:

Today Mr. Mercedes has indicated that there is no evidence of his involvement in the operation.  He indicated that he was arrested on the road.

Trial evidence demonstrated, however, that Mr. Mercedes was arrested shortly after the agents arrived, when he came out of the bushes close to where the red [Excursion] was and close to where the [33] bales of cocaine were stashed.

He has not been truthful to the Court today, and the sentence will reflect it.

The court sentenced Mercedes to 136 months in prison.  We conclude that there is a probability the district court misunderstood the colloquy and so committed sentencing error.

The district court's decision to increase Mercedes' sentence rested on an extremely doubtful finding that Mercedes was untruthful in his allocution.[9]  As we read the record, Mercedes was

_____

[9]     The government says the district court did not penalize Mercedes because it did not impose an obstruction of justice enhancement.  That argument misses the mark.  Mercedes has not contested any enhancement under the guidelines, nor has he argued he should have received a reduction (for example, for acceptance of responsibility).  Instead, as we read Mercedes' brief, he is contesting the district court's decision to impose a more severe sentence than it otherwise would have based on Mercedes' purported

simply disputing (1) the version of events that the prosecutor relayed at sentencing, which suggested that Mercedes was a major player in the drug smuggling enterprise, and (2) parts of the arresting agent's testimony.  Mercedes did not contest his guilt at sentencing.  The district court's finding that Mercedes denied "his involvement in the operation" is thus without support in the record.  Cf. United States v. Al-Rikabi, 606 F.3d 11, 14-16 (1st Cir. 2010).[10]

Mercedes' limited proficiency in English, which is apparent from the sentencing transcript, buttresses this conclusion.  Any perceived inaccuracies in Mercedes's allocution were likely a result of the language barrier, not dishonesty on Mercedes' part.  Cf. Nadmid v. Holder, ___ F.3d ___, 2015 WL 1787066, at *3 (7th Cir. Apr. 21, 2015) (rejecting an immigration judge's adverse credibility finding with respect to an asylum applicant whose "answers suggest[ed] that translation problems ha[d] made it difficult [for him] to understand the questions posed to him"); Ramsameachire v. Ashcroft, 357 F.3d 169, 180 (2d Cir. 2004) (noting that statements made by an alien who may not understand English "should be considered less reliable").

---

dishonesty during his allocution.

[10]     We note that the court's decision not to apply the safety valve, which Mercedes also challenges on appeal, was dubious.  We leave the safety valve issue for the district court to resolve in the first instance should it recur on remand.

-21-

Sentencing courts should exercise great caution before penalizing a defendant with limited proficiency in English based on arguably ambiguous statements.

                              IV.

        We <u>vacate</u> Mercedes' conviction and sentence and <u>remand</u> this case for further proceedings.